# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2763 | **DATE** | 4/24/2003 |
| **CASE TITLE** | Rufino Pena, et al. vs. American Meat Packing Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiffs' motion for summary judgment [22-1] is denied. Defendant's motion for summary judgment [24-1] is granted. Defendant's motion to strike portions of Plaintiffs' submissions [32-1] and Defendant's supplemental motion to strike portions of Plaintiffs' submissions [36-1] are denied as moot. Judgment is entered in favor of Defendant and against Plaintiffs. This case is hereby dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | APR 2 5 2003 date docketed | |
| ✓ | Docketing to mail notices. | | | 39 |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RO | courtroom deputy's initials | 03 APR 24 PM 4:15 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RUFINO PEÑA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 02 C 2763 |
| | ) | |
| | ) | Judge Ruben Castillo |
| AMERICAN MEAT PACKING | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
APR 2 5 2003

## MEMORANDUM OPINION AND ORDER

Plaintiffs filed a two-count complaint against Defendant American Meat Packing Corporation ("AMPAC"), alleging violations of the Workers Adjustment and Retraining Notification Act ("WARN" Act), 29 U.S.C. § 2101 *et seq.*, and the Illinois Wage Payment and Collection Act, 820 ILCS 115/5. Presently before the Court are the parties' cross-motions for summary judgment on the WARN Act claim.[1] For the following reasons, we deny Plaintiffs' motion for summary judgment, (R. 22-1), and grant Defendant's motion for summary judgment, (R. 24-1). We also deny as moot Defendant's motion to strike for the reasons stated in this opinion. (R. 32-1.)

---

[1] In their summary judgment motion Plaintiffs abandoned their Illinois Wage Payment and Collection Act claim. (R. 22, Pls' Mot. at ¶ 1.)

## RELEVANT FACTS[2]

AMPAC, a wholly owned subsidiary of the Pinnacle Food Group ("Pinnacle") since 1998, was a hog-slaughtering, butchering and meat-packing facility located in Chicago, Illinois. Dan Ochylski, the owner and President of Pinnacle, also acted as President of AMPAC. From August 2000 until the plant's closure in November 2001, Paul Espinosa acted as AMPAC's Director of Operations. Ochylski and Espinosa shared a combined fifty years' experience in the meat-packing business. Prior to its closure, AMPAC employed approximately 350 individuals. Plaintiffs are, and represent a class of, former AMPAC employees who lost their jobs after the plant closed on November 16, 2001. Plaintiffs were members of United Food and Commercial Workers Local 100a (later consolidated into Local 546100a).

AMPAC operated under inspection by the United States Department of Agriculture ("USDA"). During production hours, the USDA stationed at least five inspectors on-site at the AMPAC processing facility: one veterinarian inspector-in-charge, three inspectors on the "hot side" (the slaughter side of the plant), and one inspector on the "cold side" (where cutting and packaging occurred). Between November 1999 and November 2001, over 45 different USDA inspectors monitored the AMPAC facility. The USDA inspectors were on hand in order to, among other duties, monitor hog processing, ensure that conditions in the plant complied with federal regulations, and

---

[2] Defendant filed a motion to strike portions of Plaintiffs' Rule 56.1 Statement of Material Facts as well as parts of Plaintiffs' brief that rely on those facts. This Court has carefully reviewed the record and considered AMPAC's objections to Plaintiffs' submissions. We are confident that we can discern which facts should be taken as true for purposes of summary judgment, and which should be disregarded because they are properly disputed, immaterial or improperly before this Court. Except as otherwise noted herein AMPAC's motion to strike is denied. (R. 32-1.)

2

either certify product for shipment and sale or condemn product that did not meet or could not be reconditioned to meet USDA standards.

Inspectors at the plant also on occasion issued "Noncompliance Records" ("NR"), which outlined in writing instances where the inspector noted activity at the plant that did not comply with USDA regulations. The NR describes the unsatisfactory condition, identifies its date and time and indicates which supervisor was advised of the condition. The NR also informs plant personnel that "this document serves as written notification that your failure to comply with regulatory requirements could result in additional regulatory or administrative action." (R. 25, Def.'s Facts, Ex. F, NRs.) Such additional action could include, but was not limited to, "tagging" the adulterated product to prohibit its sale and withholding or suspending inspection, which prevents *any* product in the plant from being released for shipment or sale. The issuance of an NR does not necessarily lead to additional action by the USDA. Espinosa, who has worked in several different meat-packing plants over the last 35 years, stated that "none of the facilities [he] worked at had their inspection withdrawn or suspended by the USDA during [his] tenure," despite the receipt of numerous NRs. (R. 25, Def.'s Facts, Ex. A, Espinosa Decl. ¶ 4.) Defendant points out that the record contains no evidence that the failure to ameliorate a problem raised in an NR automatically leads to the suspension of inspection. (R. 30, Def.'s Facts ¶ 34.)

After generating an NR, an inspector generally presents it to an AMPAC manager or supervisor, who then responds in writing on the NR, identifying corrective measures taken to address the problem. Aside from issuing NRs, the USDA inspectors interacted daily with AMPAC management, often in attempts to resolve noncompliant activity in the plant without additional regulatory action.

3

In 1997 the USDA Food Safety and Inspection Service ("FSIS") published a proposal in the Federal Register to revise its sanitation requirements for official meat and poultry establishments. The revisions were intended to transition from a highly prescribed regulatory environment towards more flexible performance standards. The FSIS replaced a long list of "dos and don'ts" for meat-processing plants with results-driven standards that afforded plants "the flexibility to determine what is appropriate and sufficient for maintaining sanitary conditions and preventing adulteration of the product." (R. 23, Pls.' Facts, Ex. 2, FSIS Regulations at 56402.) The FSIS emphasized that the new rules created more flexible food-safety measures, unlike prior sanitation regulations that were "unnecessarily prescriptive, impeded innovation and blurred the distinction between establishment and program employee responsibilities for maintaining sanitary conditions." (*Id.*) The new rules became effective in January 2000.

Although Ochylski owned the AMPAC facility and acknowledged that he was ultimately responsible for ensuring that the facility met USDA standards, he admitted that he has no specialized training in food safety. It is clear from Ochylski's deposition testimony that he was not familiar with the specifics of the USDA regulations governing meat-packing plants and their enforcement, including the process for dealing with NRs and the consequences of failing to correct a deficiency noted in an NR. Ochylski opined at his deposition that the USDA standards are "not concrete" and leave room for interpretation in defining the sanitary conditions at a plant, but he also noted that although NRs are fairly common in the industry, they are serious and must be addressed. Ochylski stated that he was not aware of the gravity of the situation at AMPAC until he saw all of the NRs issued that fall at the end of October 2001. As President and owner of AMPAC, it was not

4

Ochylski's job to answer NRs. Rather, Espinosa, as the plant manager, handled the NRs on AMPAC's behalf; he responded to nearly every NR issued in 2001.

AMPAC employed a quality assurance ("QA") team that inspected the facility each morning, a full-time maintenance staff, and an evening cleaning crew of 13-15 employees. The QA team arrived in the early morning, prior to the arrival of the USDA inspectors and prior to the start of production in order to ensure that the production areas were sanitized and ready for operation. At 5:45 a.m. and 6:30 a.m., respectively, USDA inspectors conducted pre-operation inspections of the cold side and hot side. If the inspectors observed any sanitation issues, the QA staff would address the problem. AMPAC placed many of its own employees throughout the facility to monitor production, sanitation and USDA compliance. For example, AMPAC placed six employees on the "cold side" who were responsible for monitoring condensation and swabbing any drips as they arose. AMPAC's sanitation team inspected each department daily. Each night, the evening cleaning crew sanitized the facility. AMPAC also contracted with a pest extermination service, Assured Pest Control ("APC"), which visited the facility on weekends.

Despite these efforts, AMPAC received a series of NRs during 2001. Between January and July 11, 2001, the USDA inspectors issued nine NRs to AMPAC. The grounds for noncompliance ranged from condensation and water dripping on product to flaking paint and other contaminants on the product. New NRs often cross-referenced prior NRs with similar root causes, and sometimes reiterated that "failure to comply could result in additional regulatory or administrative action." Espinosa investigated each NR, instructed company employees how to rectify the situation, reconditioned contaminated product when possible, and reported the measures taken to the USDA. None of the NRs issued in the first eight months of 2001 directly resulted in additional

administrative action by the USDA. AMPAC did not receive any NRs during the remainder of July through the middle of September.

Starting on September 12, 2001, however, the USDA issued a barrage of NRs, citing rodent droppings in an adjacent building, condensation and water dripping onto work areas. The USDA issued a total of six NRs in September, each of which Espinosa investigated and addressed with attempted remedial action. Additionally, AMPAC tried to ameliorate the ongoing condensation problems by upgrading an existing door and installing a new door designed to reduce the amount of cold air entering the facility. Aside from a brief production stop on September 20, the USDA took no further administrative action as a result of the NRs in September. The number of NRs issued by the USDA increased to eight during the month of October. The October NRs cited three instances of rodent droppings inside the facility, three instances of overhead drips onto product, one instance of rust touching product and one failure to produce part of its documentation relating to its mandatory hazard analysis. Finally, on October 31, after the inspector noticed the third instance of rodent droppings at the facility, the USDA notified AMPAC that it was withholding inspection at the facility, which meant that AMPAC could not produce product for sale.

On October 31, 2001, following the withdrawal of inspection, AMPAC immediately began taking steps to regain inspection and resume operations. AMPAC first terminated its existing exterminator and hired another, Ecolab. The company also retained a food safety consultant to audit conditions at the plant on the evening of October 31. The consultant identified several areas of improvement, but concluded that AMPAC did not have intractable pest-control or structural problems. Ecolab also provided a written report to Espinosa, which identified some structural problems at the plant. Ecolab ultimately represented that it could totally eliminate any rodent

6

problems and promised to provide an extermination plan within the week. Meanwhile, AMPAC's maintenance team continued repairing the facility as recommended by the consultant. On November 1, 2001, AMPAC responded in writing to the October 31, 2001 NR. The report detailed the recently completed maintenance, the hiring of Ecolab and the food-safety consultant, and the increased pest-control procedures. After receiving the report the USDA restored inspection, thus permitting AMPAC to resume operations.

AMPAC received six more NRs between November 1 and November 6. These NRs addressed similar issues to those raised in prior reports: condensation, flaking paint, rust, discarded meat and fat littering the plant and rodent droppings. AMPAC responded to each NR in writing, and also took extra measures to ensure that the adverse conditions in the plant were rectified. On November 1, for example, Ochylski met with AMPAC employees to ask that they cooperate with management in maintaining USDA standards at the facility. On November 2, Espinosa sent a letter to the Chicago Department of Public Health requesting that it take steps to "rodent-proof" an abandoned building adjacent to the plant.

After the November 2 NR, the USDA again withheld inspection. AMPAC could not continue production without inspection, so it ceased operations immediately. Over the next two days, AMPAC instituted an intensive cleaning of the facility and surrounding areas. The effort took place over 40 continuous hours and involved a combined 1500 hours of work by AMPAC employees. The cleaning, combined with AMPAC's installation of certain new equipment, cost the company almost $34,000. During this period and continuing until November 9, AMPAC worked with Ecolab daily to implement a new pest elimination system.

Early in the morning on Monday, November 5, a team of USDA inspectors arrived at the plant to conduct an inspection. Afterwards, the inspectors orally notified AMPAC that it was suspending inspection at the plant, which prevented AMPAC from operating. Additionally, the USDA prohibited all the product on the premises, about one million pounds of product valued at $638,000, from being sold. The USDA then issued another NR on November 6, which summarized the conditions at the plant during the November 5 inspection. The USDA also issued a formal Notice of Suspension at that time. Espinosa responded collectively to the three NRs issued in the previous week by describing the massive plant cleaning and requesting guidance from the USDA about other necessary steps; he also requested permission to ship the product already processed at the plant but placed in a hold status by the USDA during the November 5 inspection. Meanwhile Ochylski solicited bids from an outside food quality assurance firm and contacted an attorney to assist in regaining inspection.

On November 7, the USDA notified AMPAC that it was denying the company's request to ship the product retained at the facility. On November 12, Ochylski hired a professional food safety specialist to assess conditions at the plant and to recommend improvements. Ochylski also began investigating the costs of replacing parts of the coolers to eliminate the condensation problems; the contractor he contacted informed him that these upgrades would cost approximately $3 million and would take the coolers out of commission for six months. On November 15, Ochylski sent a letter to the District Manager of the USDA that summarized AMPAC's recent efforts to conform to regulatory requirements, invited the USDA to re-inspect the facility and offered to upgrade the coolers if the USDA agreed to re-initiate inspection based on the work completed thus far. Later that day the USDA informed Ochylski that the remedial measures taken over the past several days were

8

insufficient and that the USDA expected AMPAC to destroy all AMPAC product stored at an off-site facility, approximately 1.2 million pounds of product valued at $545,000. Given the USDA's suspension of inspection on November 5, its determination that AMPAC's remedial measures were insufficient, its condemnation of over $1 million worth of product and the resulting loss of customers and suppliers, AMPAC decided to close the plant effective November 16, 2001.

Plaintiffs attach to their motion an unsigned letter dated November 8 from Ernst Brooks, AMPAC's Director of Industrial Relations, that informed employees of a temporary lay-off at the plant. This letter did not contain a WARN notice. AMPAC denies that all workers were given a copy of this letter, and some workers continued to work at the plant for another week. On November 16 AMPAC faxed the workers' union a WARN Act notice; AMPAC also sent via regular mail WARN Act notices to affected employees and gave the remaining workers at the plant a lay-off letter that did not mention the WARN Act. The WARN Act letters stated in pertinent part:

> Based on unforeseeable business circumstances, i.e., the United States Department of Agriculture's sudden, dramatic, and unexpected suspension of inspection at our Normal Avenue plant on November 2, 2001, and the implications that this unforeseeable closing has for AMPAC's ability to continue operating the plant in the future, AMPAC has decided to permanently close the plant on November 16, 2001. As a result, your employment with AMPAC will be permanently terminated on November 16, 2001.
>
> * * *
>
> This notice is given to you pursuant to the Worker Adjustment and Retraining Notification Act, which requires employers to give notice to employees who will lose their jobs due to a plant closing. Because this step was based on the USDA's sudden and unforeseeable decision to suspend inspection at this plant, we were unable to provide you with greater advance notice.
>
> * * *

9

Plaintiffs then filed suit, alleging that the WARN letters sent did not comply with the Act and were given without sufficient notice.

## LEGAL STANDARDS

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of submitting affidavits or other evidentiary material to show the absence of a genuine material issue of fact and that judgment as a matter of law should be granted in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion must then go "beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial" in order to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997); *Agrexco USA, Ltd. v. Benny's Farm Fresh Distrib. Co., Inc.*, No. 01 C 9478, 2003 WL 722232, at *1 (N.D. Ill. March 3, 2003). We do not, however, weigh the evidence or engage in credibility determinations. *Kastel v. Winnetka Bd. of Educ., Dist. 36*, 975 F. Supp. 1072, 1082 (N.D. Ill. 1997).

## ANALYSIS

The parties do not dispute that AMPAC is an employer that falls within the parameters of the WARN Act. *See* 29 U.S.C. § 2101(a)(1). Employers under the Act are required to provide employees with 60 days' notice prior to a mass layoff or plant shut down, 29 U.S.C. § 2102(a), and

10

the notice must specify a 14-day period during which the closing is expected to occur, 20 C.F.R. § 639.7(b).

The WARN Act incorporates several exceptions to the mandatory-notice provision. Because the WARN Act is a remedial statute, however, any exceptions to its application are narrowly construed, and an employer relying on an exception bears the burden of persuasion. *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640-41 (4th Cir. 1997). The exception relevant in this case provides that the 60-day notice period may be reduced or eliminated if the closings or layoffs were caused by "business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). Determining whether the exception applies requires a two-step inquiry. *Jurcev v. Cent. Cmty. Hosp.*, 7 F.3d 618, 622 (7th Cir. 1993). First we must determine whether the USDA's decision to suspend inspection on November 5 caused the AMPAC facility to close. If so, we next must decide whether the USDA's actions were reasonably foreseeable to AMPAC sixty days before they occurred.

Plaintiffs do not separately address the causation element, and instead focus entirely on foreseeability. AMPAC, on the other hand, does address causation and asserts that it was forced to shut down for three reasons all stemming from the USDA's actions: (1) the USDA's decision to suspend inspection on November 5, 2001, which required AMPAC to suspend production; (2) the USDA's decision to condemn over $1 million of AMPAC product, which had previously been approved for sale; and (3) the USDA's imposition of a series of costly prerequisites to reopening, which AMPAC did not have the financial resources to implement. There is little doubt on the record before us that AMPAC's decision to close its doors was caused by the USDA's decision to suspend inspection and its refusal to release the pre-approved product for shipment. The USDA's actions

11

rendered AMPAC's continued operation logistically and economically unfeasible and spurred Ochylski's decision to close the plant. Thus the causation element is satisfied, and we turn to the question of whether the USDA's actions were foreseeable.

Foreseeability turns on an employer's exercise of "commercially reasonable business judgment" in assessing the circumstances causing the closing. 20 C.F.R. § 639.9(b)(2). An "important indicator" of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some "sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1). For example, the federal regulations note that (1) "[a] principal client's sudden and unexpected action or condition outside the employer's control"; (2) "a strike at a major supplier of the employer"; or (3) "[a] government ordered closing of an employment site that occurs without prior notice" all may constitute unforeseeable business circumstances under the WARN Act. *Id.*

Similarly, courts have held that a variety of events satisfy the unforeseeable circumstances exception, thus excusing employers from issuing notice 60 days in advance of the closing. *See, e.g., Watson v. Mich. Indus. Holdings, Inc.*, 311 F.3d 760 (6th Cir. 2003) (major customer's decision to end business relationship not foreseeable); *Hotel Employees and Rest. Employees Int'l Union Local 54 v. Elisnore Shore Assocs.*, 173 F.3d 175 (3d Cir. 1999) (state casino commission's decision not to renew casino's license was unforeseeable); *Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056 (8th Cir. 1996) (government's cancellation of bomber contract was not reasonably foreseeable). *Cf. Childress v. Darby Lumber Inc.*, 126 F. Supp. 2d 1310 (D. Mont. 2001) (company's closing foreseeable despite bank's sudden withdrawal of line of credit in light of several months of negative earnings and management's consideration of mass layoffs five months beforehand).

12

The salient question before this Court is whether AMPAC could have foreseen on September 6, 2001 that its doors would be closed by November 6, 2001. Plaintiffs argue that AMPAC did not exercise commercially reasonable business judgment in virtually any aspect of its operation, including the circumstances surrounding the plant's closure. Had AMPAC used commercially reasonable business judgment, Plaintiffs argue, the company would have been on notice that the plant's closing was inevitable. To this end, Plaintiffs point to the following four circumstances that they claim should have alerted AMPAC of the plant's demise: (1) the condition of the plant, as reported by various employees; (2) the USDA's issuance of NRs in 2001; (3) AMPAC's decision to devote most of its capital to increasing production instead of complying with regulatory sanitation standards; and (4) AMPAC's ignorance of governing USDA regulations. We address each argument in turn.

First, Plaintiffs argue that the conditions at the plant were so egregious that AMPAC knew the plant eventually would be closed. In support, Plaintiffs offer statements from several plant employees describing the facility as a hotbed of filth and contamination evocative of Upton Sinclair's *The Jungle*. This testimony, if true, leads us to believe that the plant's closing probably was a blessing, but is largely irrelevant to the inquiry before us—namely, whether the USDA's actions at the end of 2001 were foreseeable to AMPAC management during the time frame within which they occurred.[3] Foreseeability in this case does not revolve around the employees'

---

[3] AMPAC moves to strike the declarations of three witnesses and the corresponding fact sections on the ground that these witnesses were not disclosed during discovery. AMPAC also seeks to strike testimony of other witnesses based on relevance and hearsay grounds. For the reasons stated in this opinion, we believe that this information is not completely irrelevant, but simply is not material to deciding whether the plant's closing was foreseeable to Defendant, especially in light of the inconsistency in the USDA's approach to enforcing its regulations. Thus we deny Defendant's motion to strike the employees' testimony.

observations and beliefs about plant conditions, but rather around AMPAC's interaction with the USDA and whether the USDA's withholding, and then suspending, inspection at the end of 2001 was foreseeable to AMPAC at least sixty days earlier. The record contains no evidence that plant conditions changed for the worse during 2001, which would offer a rational explanation of the USDA's frenzied activity in September through November 2001. In this respect Plaintiffs' proffered evidence actually proves too much; the employees' testimony often includes incidents and conditions present throughout all of 2001 and earlier, thus supporting AMPAC's claim that they did not foresee the USDA's actions. (R. 23, Pls.' Facts, ¶¶ 57-61, 75.) That is, if the horrific plant conditions were ongoing but the USDA, for whatever reason, chose not to enforce its own regulations and standards, it cannot be said that the plant's closing was foreseeable to AMPAC.

For the same reasons, we reject Plaintiffs' argument that the series of NRs that AMPAC accumulated during 2001 should have alerted the company that the plant was going to be closed. Plaintiffs essentially argue that the NRs, which informed AMPAC that failure to comply with the regulations "could result in additional regulatory or administrative action," was the writing on the wall that the plant was ripe for a shutdown. We disagree.

AMPAC freely admits that the plant struggled with condensation issues, peeling paint and rust, some product adulteration due to overhead materials dripping onto work areas, as well as some rodent problems towards the end of 2001. But it was Ochylski and Espinosa's understanding, based on their interaction with the USDA as well as their years of experience in the industry, that the USDA did not consider the plant's condition to be critical despite the NRs issued during 2001. They also were under the impression that the USDA would warn AMPAC of an impending suspension and provide some opportunity to remedy non-complying conditions before actually withdrawing or

14

suspending inspection. The history of the non-compliance reports, at least throughout 2001, had maintained a pattern of complaint and attempted amelioration. The USDA would note an area in violation or needing improvement and AMPAC would address the issue or explain what measures it was taking to do so. AMPAC's beliefs that such measures were sufficient were bolstered by the USDA's inconsistent approach to enforcing its own regulations between January through July, 2001 as compared to September through November 2001. Finally, there is no evidence in the record that the USDA warned AMPAC that it would suspend inspection indefinitely if the plant received a certain number of NRs. Thus we cannot say that AMPAC should have foreseen the shut down simply because it received NRs during the preceding year, or even because it received more NRs than usual immediately prior to the suspension of inspection. The plant had operated for several years with this type of inspection process and never once had the USDA suspended inspection in this manner. Additionally, the fact that AMPAC spent thousands of dollars and man-hours in its attempts to remedy its noncompliance up to and including the date that the USDA suspended inspection supports our finding that AMPAC simply did not foresee that plant closure would result from the USDA's increased activity over the prior two months.

Courts have routinely rejected similar arguments that circumstances causing a plant's closure cannot be deemed sudden, dramatic or unexpected (that is, unforeseeable) if the writing is on the wall beforehand. *See Jurcev*, 7 F.3d at 626 (events not foreseeable just because defendant hospital "had long been aware" of the events underlying its supporting foundation's decision to discontinue support); *see also Clinchfield*, 124 F.3d at 641-42 (despite ongoing contractual haggles with primary purchaser of defendant's coal, defendant could not foresee sixty days in advance that purchaser would offer low-ball purchase price that was economically impossible for Defendant to accept);

15

*Jones v. Kayser-Roth Hosiery, Inc.*, 748 F. Supp. 1276, 1285 (E.D. Tenn. 1990) (fact that "old and inefficient" plant had been losing money and was at the "end of its economic life," and that plant had failed 7 of 12 audits conducted by customer in months prior to closing did not make closing foreseeable 60 days prior, but became foreseeable within 30 days of closing, which is when the WARN notice should have been issued).

Furthermore, the WARN Act deals in probabilities, not possibilities. *See Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998).[4] Thus, just because additional administrative action was *possible* after every NR, did not make it *probable* that closure would occur when it did, especially in light of the USDA's historically spotty approach to handling noncompliance issues at AMPAC. Similarly, just because AMPAC was on notice that there were problems at the plant, did not make it foreseeable that it would shut down *when it did*. In summary, the facts of this case as well as the relevant caselaw convinces us that AMPAC could not have foreseen in early September that it would close its doors by November. The company issued WARN Act notices immediately after its decision to close the plant.[5]

---

[4] The cases Plaintiffs rely on are inapposite, since they address only plant mergers and sales, which in those cases were clearly foreseeable well in advance of the plant lay-off or closing.

[5] Plaintiffs' remaining two points are without merit. Plaintiffs' assertion that AMPAC devoted its capital to increasing production instead of complying with regulatory standards is not supported by admissible evidence in the record and in fact somewhat undercuts Plaintiffs' premise that AMPAC could foresee in September 2001 that its plant would be closed within two months. Similarly, Plaintiffs' argument that AMPAC's ignorance of governing USDA regulations made the plant's closure foreseeable also is unsupported by the record and irrelevant to the foreseeability analysis. Plaintiffs have provided no evidence that the USDA regulations apprise plant owners of the circumstances under which a plant could expect "additional administrative action" after an NR, such as the suspension of inspection that occurred here. Also, Plaintiffs demonstrated only Ochylski's ignorance of the regulations, which is not material given Espinosa was the person in charge of the implementation of USDA regulations at the plant.

## CONCLUSION

We sympathize with the workers who lost their jobs at the AMPAC plant in November 2001. Although we are dismayed by the allegations concerning the plant conditions and we question the USDA's enforcement policies, these concerns do not translate into a viable claim under the WARN Act. We conclude that AMPAC could not have foreseen the closing of its plant and thus is not liable for its failure to give sixty days' notice to its employees under the WARN Act. The undisputed facts establish that AMPAC reasonably concluded that it would be allowed to operate while continuing to address the USDA's concerns on a piecemeal basis. Accordingly, we deny Plaintiffs' motion for summary judgment, (R. 22-1), and grant Defendant's motion for summary judgment, (R. 24-1). We also deny as moot Defendant's motion to strike. (R. 32-1.) The Clerk of the Court is instructed to enter judgment, pursuant to Federal Rule of Civil Procedure 58, in favor of Defendant.

ENTERED: _____
Judge Ruben Castillo
United States District Court

**Dated: April 24, 2003**